Joe Nathan James, Jr., appeals from his conviction of capital murder, a violation of § 13A-5-40 (a) (4), Ala. Code 1975. On August 26, 1996, James was tried before a jury on the charge that he murdered Faith Hall during the commission of burglary in the first degree, on August 15, 1994. Following the guilty verdict, the jury recommended, by a vote of 10 — 2, that James receive the death *Page 778 
penalty. The trial court imposed the death sentence recommended by the jury. James appeals.
The State's evidence tends to show the following. James was a former boyfriend of Faith Hall's and had a history of harassing her. On August 15, 1994, Faith and a friend, Tammy Sneed, were returning to Sneed's Birmingham apartment after a day of shopping. When they reached Sneed's apartment, they hurried inside, having seen James behind them in the rearview mirror of their car. Inside the apartment, Hall, Sneed, and a neighbor, Bridget Gregory, discussed what they should do about James. Sneed's two children were also in the apartment. They decided they should notify the police. When Gregory left to telephone the police, James was at the apartment door and forced his way in as Hall and Sneed tried to hold the door closed. Once inside the apartment, James, armed with a pistol, accused Hall of being unfaithful. After initially putting the pistol in his waistband, James drew the weapon and, as the women tried to run from the room, shot Faith Hall. After she fell, James shot Hall again. Faith Hall died of multiple gunshot wounds to the head, chest, and abdomen.
Because we are compelled to reverse based on the first issue, only two issues will be discussed. We discuss the second issue, not because it is reversible error, but out of our concern that on retrial it could possibly lead to error warranting reversal.
 I.
James argues that the trial court erroneously admitted into evidence four police reports incriminating him in prior uncharged misconduct. Specifically, he argues the reports were inadmissible because, he says, they contained inadmissible hearsay.
In a pretrial proceeding, the prosecutor informed the trial court that he intended to introduce four "Incident/Offense" reports created by the Birmingham Police Department, which resulted from complaints filed by Faith Hall and her grandmother during the year preceding her death. There had been three harassment complaints and a burglary complaint. In each incident, the police responded to the complaint and, in the normal course of their duty, filed a police report, which included a synopsis of Ms. Hall's or her grandmother's complaint. The pertinent parts of the reports are as follows:
"Victim: Hall, Faith;
Suspect: James, Joe Nathan
Occurred on or between: 10-12-93 and 10-14-93
Date of Report: 10-14-93
 Synopsis: Between the listed dates and times victim stated that suspect has been calling and making threats on her and her ex-husband's life. Victim stated that she informed suspect that she did not wish to see him any more. Suspect stated that he was going to kill her and her ex-husband. Case information card [CIC] issued. Warrant procedures explained."
(C.R.99-100)
"Victim: Smith, Faith
Suspect: James Johnson Nickname: Jam
Occurred on or between: 09-02-93 and 09-03-93
Date of Report: 09-03-93
 Synopsis: Reporting person stated between the occurred dates and times the suspect(s) entered into her apartment and damaged several items, also taken food out of the kitchen. Reporting person stated the suspect entered the apartment by way of front window and exited out of the front door."
(C.R.101-02.)
"Victim: Smith, Faith
Suspect: James, Joe
Occurred on or between: 11-21-93
Date of Report: 11-22-93
 Synopsis: On the date and time of incident the victim stated that the suspect came to the listed location and began banging on the window. The [victim] stated that the suspect then walked from her bedroom window around to the back door and began banging on it but she would not let her [sic] in. The [suspect] fled the scene. [The victim] stated that the [suspect] calls her house constantly and goes to her job and harasses her. The [victim] stated that *Page 779 
 the [suspect] threatened to hurt her if she notified the police. CIC issued."
(C.R.103-04.)
"Victim: Hall, Isabelle
Suspect: unknown Nickname: Jam
 Occurred on or between: 04-01-94 and 08-13-94
Date of Report: 08-13-94
 Synopsis: The [victim] stated that the suspect (her granddaughter's ex-boyfriend) continues to come to her house all hours of the day and night ringing her doorbell and sitting in her driveway blowing his horn. The [victim] stated that the suspect also continues to call her house all hours of the day and night. The [victim] stated that she told the suspect not to call her and to stay away from the house several times, but the suspect refuses to stay away. CIC issued. Warrant procedures explained."
(C.R.105-06.)
There was never any additional investigation, arrest, or a prosecution following any of the complaints. The prosecutor informed the court that he wished to introduce the police reports into evidence under Rule 404 (b), Alabama Rules of Evidence, "for the purposes of proving intent, for purposes of proving motive, for purposes of proving preparation, plan and knowledge, and identity." (R. 150.) James objected to the introduction of the police reports on the basis that they were hearsay, noting the reports were being offered to prove that Ms. Hall's complaints documented in them were true. The prosecutor argued the reports were admissible as a business records exception to the hearsay rule. The trial court overruled James's objections and, after the prosecutor called the police officers who made the police reports as witnesses and laid a foundation for a business records exception, admitted all four police reports.
"Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." Edward W. Cleary, McCormick on Evidence
584 (1972). Hearsay is not admissible except as provided by the Alabama Rules of Evidence or by other rules adopted by the Supreme Court of Alabama or by statute. Ala. R. Evid. 802. Hearsay is not admissible because it violates the right of confrontation and cross-examination guaranteed by theSixth Amendment to the United States Constitution. To overcome the inability to confront a witness, a statement by an out-of-court declarant must bear an "adequate indicia of reliability." Reliability can be inferred in a case where the evidence falls within a firmly rooted hearsay exception. Idaho a Wright,497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), quotingOhio v. Roberts, 448 U.S. 56, 65, 100 S.Ct. 2531,65 L.Ed.2d 597 (1980).
The "firmly rooted hearsay exception" relied upon in this case was the business records exception found in Ala. R. Evid. 803 (6). Under Rule 803 (6), the following would not be excluded by the hearsay rule, without regard to the availability of the declarant:
 "A [report] of acts, events, conditions opinions, or diagnoses, made at or near the time by, or from information transmitted, by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the [report], as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."
The underlying rationale behind this exception is that business records have the "earmark of reliability" or "probability of trustworthiness," because they reflect the day-to-day operations of the enterprise and are relied upon in the conduct of business.Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645
(1943).
In this case, the prosecutor called each police officer who created a police report as a result of a complaint from Ms. Hall or her grandmother. Each police officer testified that his or her report was filled out as part of the normal duties as Birmingham police officers; that each report was dutifully logged in to precinct headquarters, as required; and that each report was a true and *Page 780 
accurate copy of the report the officer had filled out as a result of the complaint. Under cross-examination, the police officers all agreed that they had been dispatched in response to a complaint, and that their job was to take the complaint and to file the report. None could vouch for the credibility of Ms. Hall or her grandmother; none made an additional investigation to try and prove the complaints; and none took a sworn statement from the complainants. None of the officers were aware whether a warrant was ever made out against James as a result of the complaints.
In his objection at trial, James argued to the trial court that the police reports were inadmissible hearsay because they contained "factual information" and were being introduced to prove the truth of the matter therein. He pointed out that, while the police may have had a duty to create their reports, Ms. Hall was under no legal duty to make a complaint. (R. 153-54.) In other words, James was arguing that the hearsay within the hearsay was the actual reason for the state's offering the reports, and that, therefore, they should not have been admissible.
Ala. R. Evid. 805 states that hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements comes within an exception to the hearsay rule. According to the Advisory Committee Notes:
 "Instances arise in which an out-of-court statement by one declarant contains a statement made by yet another declarant. Such instances are variously termed `hearsay within hearsay,' `totem pole hearsay,' or `multiple hearsay.' . . . The fact that one statement qualifies as coming within a hearsay exception does not necessarily ensure that the other statement so qualifies. . . . Each declarant's statement, considered individually, must satisfy the hearsay concern by either qualifying under a hearsay exception or being, by definition, nonhearsay."
In a case similar to this one, the Court of Appeals for the Fifth Circuit, in United States v. Shiver, 414 F.2d 461 (5th Cir. 1969), held that a prosecutor could not introduce a police report reflecting that a car had been stolen in order to prove that the car was, in fact, stolen. There, the Court noted that "the mere recordation of the statements [from the car owners] imports no guaranty of the truth of the statements themselves and that there is no reason for supposing that [the business records exception under Rule 803 (6)] intended to make admissible hearsay of this sort." The Court then cautioned trial judges to exercise caution to be sure that a document offered under this hearsay exception had an inherent probability of trustworthiness. United States v.Shiver, 414 F.2d at 463.
This same rationale was expressed by the Alabama Supreme Court in Reeves v. King, 534 So.2d 1107 (Ala. 1988), in holding a police report inadmissible under the business records exception to the hearsay rule:
 "`Ordinarily, the reports of investigating officers are not admissible in evidence. Nettles v. Bishop, 289 Ala. 100, 266 So.2d 260 (1972); and Vest v. Gay, 275 Ala. 286, 154 So.2d 297 (1963). See also § 32-10-11
Ala. Code 1975. They are deemed hearsay and do not fall within the "business records" exception to that exclusionary rule. Pike Taxi Co. v. Patterson, 258 Ala. 508, 63 So.2d 599 (1952). Therefore, to be admissible, that portion of the report sought to be introduced must come within the ambit of some other exception to the hearsay rule.' Dennis v. Scarborough, 360 So.2d 278 (Ala. 1978).
". . . .
 ". . . The accepted rationale for excluding police reports from the operation of the business records exception is that the statements of bystanders that police officers incorporate within the record are typically not made pursuant to a routine business duty."
Reeves v. King, 534 So.2d at 1114; see C. Gamble, McElroy's
Alabama Evidence, § 254.01 (7) (d) (5th ed. 1996).
The only attempt by the state to offer a "firmly rooted hearsay exception" to the complaints of Ms. Hall and her grandmother was an argument that the police reports recorded the "present sense impressions" of the complainants. (R. 154-55.) *Page 781 
Rule 803 (1), Ala. R. Evid., defines a present sense impression as a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." It is the closeness in time between the event observed and the statement that describes the event that negates the likelihood of a deliberate conscious misrepresentation. Ala. R. Evid. 803 (1) (Advisory Committee Notes). While the statement may be made after the event or condition, the intervening time between the statement and the event or condition should be short. The length of time allowed should be that is needed "for translating observation into speech." C. Gamble, McElroy's Alabama Evidence, § 265.02 (3) (5th ed. 1996). "Thus, a bystander's comment, made shortly before an accident, that the bystander and companions had better move out of the way as the approaching automobile could not make the curve at the speed it was traveling, has been held to be admissible." C. Gamble, McElroy's Alabama Evidence, § 265.02 (1) (5th ed. 1996). But a drug informant's statement to police, after he purchased cocaine from a defendant who was in a car at a body shop and then travelled to a restaurant where he reported his observations to police, was found to be not sufficiently contemporaneous with his receipt of the cocaine to come within the present sense impression exception of Fed.R. Evid. 803 (1).United States v. Cruz, 765 F.2d 1020, 1024 (11th Cir. 1985).
In this case, the police reports were admitted into evidence to show that the appellant had threatened or harassed Ms. Hall in the months before she was killed. Thus, it was not the existence of the reports themselves, but the complaints of Ms. Hall or her grandmother that were the evidence placed before the jury. Therefore, it was not sufficient for the state to prove the reports were created in the normal course of business of the Birmingham Police Department. The state also had to prove the statements made to the police by Ms. Hall and her grandmother fell within a recognized exception to the hearsay rule. This the state did not do. There is no evidence that the statements of Ms. Hall or her grandmother were made contemporaneously with, or close in time to, the events that precipitated the complaints. In fact, the evidence shows the complaints were made days after the events that were being reported. (C.R.99-106.) The complaints were not voiced perceptions of an occurring event, but were recollections of past events. The declarants had time to plan and to formulate their statements before telephoning the police. Therefore, there was no evidence that the statements of Ms. Hall or her grandmother had the requisite indicia of reliability or "particularized guarantees of trustworthiness" to overcome their characterization as hearsay. Ohio v. Roberts, supra. We therefore hold that the trial court erred in admitting the four police reports containing the hearsay statements of Ms. Hall and her grandmother.
However, a finding of error does not complete our review. We must now determine whether the admission of the hearsay statements was harmless error. A denial of the light of confrontation may, in some circumstances, result in harmless error. Delaware v. Van Arsdall, 475 U.S. 673, 680-84,106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry to use in determining whether the error in this case is harmless was set out by the United States Supreme Court in Chapman v. California,386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In that case, the Supreme Court stated:
 "In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence or argument, though legally forbidden, finds its way into a trial in which the question of guilty or innocence is a close one.
 ". . . We prefer the approach of this Court in deciding what was harmless error in our recent case of Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 [(1963)]. There we said: `The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' Id., at 86-87, 84 S.Ct. at 230. . . . Certainly error, constitutional error, in illegally admitted highly prejuducial *Page 782 
evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was not injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in Fahy v. State of Connecticut about `whether there is a reasonable possibility that the evidence complained of did not contribute to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our Fahy case when we hold, as we now do, that before a federal constitutional error can be held harmless the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard . . . "
Chapman v. California, 386 U.S. at 23-24, 87 S.Ct. at 827-28
(footnotes omitted.) This harmless error standard has been applied in hearsay cases. United States v. Cruz, 765 F.2d 1020,1025 (11th Cir. 1985).
There are numerous factors which can be considered in assessing harmless error, including "the importance of the [declarant's] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the [declarant] on material points, . . . and the overall strength of the prosecution's case." Delaware v. Van Arsdall 475 U.S. at 684, 106 S.Ct. 1431.
Without using the complaints filed by Faith Hall with the police, the State had a solid case against James. Three witnesses identified James as the person who found his way into the apartment. Two of the three witnesses testified that they actually saw James shoot at Faith Hall.
Trenicha Holyfield testified that she saw James sitting on her porch before the murder. She then said,
 "I seen him walk into the apartment. . . . I heard the gunshots and then he had to leave out the back because I seen him jump over the gate. It's a gate right on the side of the apartments. He jumped over the gate and then I seen the car pull off real fast."
(R. 221.)
Bridget Gregory testified that she was watching through the apartment window and saw James point the gun and shoot at Faith Hall. She testified she saw Faith Hall running towards the apartment bathroom, saw her fall as James shot at her, and then saw him shoot again. She identified James as the man whom she saw shooting at Faith Hall. (R. 276-78.)
Tammy Sneed also identified James as the man who shot at Faith Hall. She was in the apartment when James forced his way through the front door. She testified:
 "[Faith] ran to the front door and he started shooting at her. She ran in the bathroom and he ran behind her. I was by that time in the living room running out the front door. I could still hear gunshots. As I ran back in the house, he was coming out the bathroom at that time. [Faith] was lying on her back in the bathroom. Joe Nathan James looked at me and ran out my back door."
(R. 377-82.)
With these witnesses' identifying James in court as the man who was shooting at Faith Hall, the crux of the defense was to raise questions about these witnesses' testimony. In cross-examination, trial counsel highlighted the fact that neither Gregory or Holyfield could identify James as the shooter in a photograph lineup conducted immediately after the murder. He brought out the fact that neither witness showed up for a live lineup that had been arranged especially for them to identify the shooter. Trial counsel also presented evidence that indicated that on the night of the murder Gregory had told police investigators that she had not witnessed the shooting. *Page 783 
Tammy Sneed identified James in a photograph line-up shortly after the shooting. In cross-examination, trial counsel introduced evidence that Sneed had seen Faith Hall's ex-boyfriend on only one previous occasion, and knew him only as "Jam" until someone at the lineup told her the person she had identified was Joe Nathan James. The police investigator denied he would ever release a name from a lineup.
The prosecution countered these attacks on the witnesses' ability to identify James with Faith Hall's statements in the police reports showing that "Jam" was a nickname for James and that he had previously threatened violence and had even threatened to kill her months before the murder. The prosecutor bolstered his in-court identification evidence with the police reports, arguing that Hall had "laid a paper trail" straight to Joe Nathan James. (R. 603.) Thus, even though the State had eyewitnesses, Faith Hall's statements to the police were important evidence identifying James as her killer and bolstering the credibility of the witnesses.
The State argues that the hearsay evidence was cumulative because, it argues, Faith Hall's mother, Ada Hall, identified James in court. She then testified that she knew James through her daughter; that Faith Hall and James were at one time "going together"; and that they had "broken up" about three to four months before her death. The following questions were then asked of Mrs. Hall:
 "Q [trial counsel]: All right. And did you have the occasion to be around when Joe Nathan James would show up?
"A Yes.
 "Q: All right. And during this time or this occasion or these occasions, were the police notified?
"A: Yes."
(R. 172-73.)
Ada Hall's testimony that she was present when James would "show up" after his relationship with Faith Hall had ended is not cumulative to the statements of Faith Hall and her grandmother presented through the police reports. Her testimony does not even hint that James had been accused of threatening to kill Faith Hall; that he had been accused of breaking into the Hall residence and of taking items from the home; that he had been accused of calling and coming by the residence at all hours of the day and night, honking his horn and banging on windows, even after being told to cease his behavior; and that he had been accused of threatening to hurt Faith Hall if she reported his conduct to the police. (C.R.99-106.) It was only through the police reports that the jury heard of James's death threat and his "stalking" of Faith Hall which, according to the reports, dated back, not the three or four months testified to by Ada Hall, but almost a year before Faith Hall's death.
It was the statements of Faith Hall and her grandmother that the prosecutor repeatedly used in his closing arguments:
 "[Prosecutor]: But this is not something that starts out on the 15th. This is something that goes all the way back to, if I'm not mistaken, September of 1993, almost 11 months before when Faith Hall makes a report to the police department that Joe James, an ex-boyfriend, is harassing her.
 "MR. WILKINSON [trial counsel]: Excuse me, Mike, if this is a good point. I just want to object to this portion of the argument about these prior complaints on the same ground, then I won't interrupt again.
 "THE COURT: Overruled. It's part of the evidence. Go ahead, Mr. Anderton.
 "MR. ANDERTON [prosecutor]: In September of 1993, she made a complaint that the guy had broken into her apartment. In October, she makes a complaint that he has harassed her, he won't leave her alone. He keeps calling, he keeps coming over in October, 10 months before her death. November, there's another complaint.
 "And then in August, two days before Faith Hall is killed, they make another report. The grandmother makes the report, Isabelle hall. And I think you heard testimony from Ada Hall, who was Faith's mama, that Faith and her two kids were living over there with Isabelle at the time of her death. And Isabelle Hall made a report the guy has been harassing her ever *Page 784 
since April of the year before. Ever since April he had been honking, he had been coming over there, he'd been calling."
(R. 460-461.)
 "He is one of these people that . . . `I'm going to have her. She's mine. Can't anybody touch her. And I'm going to win her back by bothering the living stew out of her, harassing her.' So he decided to say, `This is it.' If he can't have her, nobody will. And nobody will, nobody will at this point because of his decision, his burglary, his murder, his decision to rush that house and kill the girl. It's not right. "We should all have the right to say, `I don't want to go out with you, anymore. Leave me alone.' And after 10 months, 11 months of being told, `Go away,' someone should be getting the message."
(R. 465.)
 ". . . You call the police and you file a report. You call the police and you file a report and you let the police know what's happening. Faith Hall left a paper trail going straight at this guy. She called the police when he would bother her and she called them again and she called them again, and at one point, her grandmother called them saying `Jam, Joe James, Joe Nathan Johnson, is my ex-boyfriend and I've told him to go away and he won't go away. He keeps calling and harassing. He's going to kill me.'"
(R. 503-04.)
 "Joe Nathan James is the one that Faith turned in as harassing her. Joe Nathan James is the one that Faith turned in to the Birmingham Police Department. His nickname was Jam. This is him."
(R. 511.)
 "You know, Mr. Wilkinson made mention of the fact that it's pretty difficult to deal with these prior complaints when the complainant is not here to be asked about those complaints. And I bet you anything in the world there [are] a lot of people in this world that wish that Faith Hall were here to answer those questions, but she's not. She's not because the man followed through with what he said he was going to do; followed through with what Faith Hall was scared he would do, and that is kill her."
(R. 515.)
 "He's been harassing her. One of the reports says he's going to kill her. Tammy said, `He's going to kill me,' some of Faith's last words. I submit to you the guy's guilty. He's guilty of capital murder. Thank you."
(R. 518-19.)
As the United States Supreme Court noted in Fahy v.Connecticut, supra, "We are not concerned here with whether there was sufficient evidence on which the [appellant] could have been convicted without the complained of evidence. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Because the erroneously admitted evidence contained accusations of a prior death threat and threats of harm, and because the prosecutor used those accusations as showing a "paper trail" laid by the declarant to identify James as her murderer, we cannot say beyond a reasonable doubt that the error was harmless. We also cannot say that those statements did not affect the jury in its sentencing deliberations and in their death penalty verdict. We find that the erroneous admission of the police reports was prejudicial and that, therefore, the conviction must be reversed.
 II.
Even though our disposition of the issue above results in a reversal, one other issue warrants our attention.
After a finding of guilty had been returned, the judge, the defendant, and counsel participated in a hearing outside the presence of the jury, discussing what the parties intended to present and argue during the sentencing phase. At the end of that hearing. the trial court announced:
 "THE COURT: It's been my practice in the past to give the jury instructions before you begin your arguments and present any evidence which seems to be more logical to me so they'll understand the significance of what you're saying. Does anybody have any objection to that? *Page 785 
"MR. WILKINSON [trial counsel]: No, sir.
 "MR. ANDERTON [prosecutor]: No, sir. That's fine."
(R. 544-54.)
When the jury returned, the trial court gave its complete instructions on sentencing in a capital case, including instructions on aggravating and mitigating circumstances, burden of proof, voting requirements, jury responsibility in sentencing, and the jury voting process. Neither counsel voiced any objections to the court's charge to the jury. Then, after both sides adopted the evidence presented during the guilt phase, counsel were allowed to present their closing sentencing arguments.
After the prosecutor ended his final argument, the trial court announced:
 "THE COURT. All right, folks. I'm going to let you go back and begin your deliberations. We'll send the verdict forms back there. If you have any questions or if you want me to go over my instructions again, please let me know. I'll be glad to do that. Are there any questions at this point? Okay. Y'all go back and begin your deliberations, please."
(R. 586.)
Whereupon the jury began its deliberations and returned with a verdict of death, by a vote of 10-2.
By charging the jury on sentencing before counsel's arguments, the trial court violated the letter of Rule 21.1, Ala. R. Crim. P., which, in pertinent part, states:
 "The court shall inform counsel of its proposed action upon [any written] requests [for jury instructions] prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed."
(emphasis added.)
James argues that this violation of Rule 21.1, Ala. R. Crim. P., constituted reversible error. We do not agree that reversible error occurred in this case but we write to express our belief that a trial court can indeed commit reversible error by not complying with the clear requirements of Rule 21.1, Ala. R. Crim. P.
This Court must review the jury instructions given by a trial court as a whole. Land v. State, 678 So.2d 201, 222 (Ala.Cr.App. 1995), aff'd, 678 So.2d 224 (Ala. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). The instructions in this case accurately stated the principles of law, the issues, and responsibilities of the jury. As we noted above, trial counsel did not object to this violation of the rule, nor did he complain after the instructions were given, nor did he request any additional instructions at the close of arguments. The trial court gave the jury the opportunity to ask questions and to request additional instructions at the end of arguments and before beginning its deliberations, and the jury was apparently satisfied with their earlier instructions. We particularly note that there was no great time lapse between the trial court's instructions and the jury's deliberations. Considering all these circumstances, we cannot say that the appellant was prejudiced by the sequence of the trial court's sentencing instructions. There is no plain error here.
While we do not find error in this particular case, we do not condone the practice of charging the jury, especially in a capital murder case, before the arguments of counsel, in either the guilt or sentencing phase of trial. We understand that preliminary instructions can often be helpful for jurors, and we commend the trial judge for taking the time to educate the jury about its duties and the basic principles of law it would apply in its deliberations. However helpful preliminary instructions may be, though, they cannot serve as a substitute for a complete jury charge, as the rule requires, after counsel have completed their arguments. A final jury charge gives the trial court the last opportunity to be heard. It focuses the jury on the law, the evidence, and its responsibilities, and also allows the jury a time to recover from the purely emotional aspects of counsel's arguments prior to its deliberations.
If a trial court believes preliminary instructions should be given to assist the jury in understanding the legal process, Rule 21.1 requires the judge to also give comprehensive *Page 786 
jury instructions after closing arguments, even at the cost of extensive repetition. See Blandburg v. State, 209 Ga. App. 752,754, 434 S.E.2d 510, 512 (Ga.Ct.App. 1993). To disregard the mandatory requirements of Rule 21.1, Ala. R. Crim. P., is to straddle a fine line between harmless and reversible error.
In accordance with our opinion above, the judgment below is reversed and the cause remanded for an new trial.
REVERSED AND REMANDED.
LONG, P.J., and McMILLAN, BROWN, and BASCHAB, JJ., concur.