[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11855

_____

D.C. Docket No. 2:10-cv-02929-CLS-HGD

JOE NATHAN JAMES,

Petitioner-Appellant,

versus

WARDEN, HOLMAN CORRECTIONAL
FACILITY,
ATTORNEY GENERAL, STATE OF ALABAMA,
COMMISSIONER, ALABAMA DEPARTMENT
OF CORRECTIONS,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(April 28, 2020)

Before ED CARNES, Chief Judge, MARTIN, and GRANT, Circuit Judges.

GRANT, Circuit Judge:

Joe Nathan James has been tried, convicted, and sentenced to death twice for the murder of Faith Hall Smith. In this appeal, he seeks federal habeas corpus relief on the ground that his attorneys provided constitutionally ineffective assistance in the penalty phase of his second trial by failing to investigate or present mitigating evidence. After a thorough review of the record, and with the benefit of oral argument, we conclude that the Alabama Court of Criminal Appeals reasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in rejecting James's ineffective assistance of counsel claim because he has failed to show a reasonable probability that his counsel's performance affected the outcome of his sentencing proceeding. We therefore affirm.

## I. BACKGROUND

### A.

James and Smith dated for a time in the early 1990s. They had a volatile relationship and James stalked and harassed Smith after they broke up, showing up uninvited at her home on several occasions and threatening to kill Smith and her ex-husband. On the day of the murder, James followed Smith to her friend's apartment and forced his way inside, carrying a gun. James demanded to know about a man he had seen with Smith, while Smith hid behind her friend and asked him to put the gun away—which he did, briefly. After a few minutes, however, James said "f**k this s**t," pulled his gun back out, and started shooting. Smith

2

ran toward the bathroom and James chased her.  James shot Smith three times: once in the abdomen, once through the arm and chest, and once in the top of the head, apparently after she had fallen to the floor.  She died of her gunshot wounds.

A Jefferson County, Alabama jury first found James guilty of Smith's murder and recommended the death penalty in 1996.  *See James v. State*, 723 So. 2d 776, 777–78 (Ala. Crim. App. 1998).  The Alabama Court of Criminal Appeals reversed his 1996 conviction based on the erroneous admission of hearsay evidence during his first trial.  *See id.* at 784, 786.

### B.

Attorneys Virginia Vinson and Gordon Warren were appointed to represent James six months before his second trial.  Vinson was an experienced criminal defense attorney who had participated in dozens of capital murder cases and had been lead counsel in at least ten of those cases.  Warren was a new attorney with no capital case experience.

Vinson was lead counsel and, according to Warren, had primary responsibility for investigating mitigation evidence.  Warren's responsibility leading up to trial was to develop the facts surrounding the murder.  He did nothing to prepare for the penalty phase or to investigate possible mitigation evidence—he did not even consider the matter, although he presented the defense argument during the penalty phase.

3

Vinson, on the other hand, did some investigation into possible mitigating circumstances. She met with James at Holman prison soon after she was appointed. He told her that he shot Smith after Smith charged him. When Vinson asked—several times—whether he had any witnesses (presumably for either phase of trial), he said that he had none. To the best of Vinson's recollection, James would not give her the names or contact information of any family members, except for his grandmother. Vinson spoke with James's grandmother on the telephone, but she was not able to provide any useful information. She also spoke with James's mother, but his mother did not want to get involved.

It appears that Vinson made no other efforts to collect mitigation evidence before trial. She did not contact any other family members, although James's siblings (two of whom were adults) were identified in the presentence investigation report completed before the first sentencing hearing. She did not contact Mara Ruffin, James's former girlfriend and the mother of his two young daughters, although her name, address, and Social Security number were in Vinson's file materials. She did not seek any school, employment, social services, medical, or prison records.

Vinson did not request funds for a psychological evaluation or review the psychological evaluations contained in James's prison records because there was no indication in speaking with him that he had any mental problems. She was

4

familiar with the psychologist who had conducted James's competency evaluation before his first trial and believed the psychologist to be capable and unbiased. The psychologist's report stated that James was competent to stand trial, had a Verbal IQ of 102 (average), and did not display any "signs or symptoms associated with a major psychiatric disorder such as psychosis, a thought disorder, or a major affective disorder."

James was moved from Holman prison to Jefferson County jail shortly before trial. Vinson and Warren met with him several times thereafter, but he did not have much to say. He instructed them not to get his family involved. He did not want to see his family, and he did not want them to testify. He advised his attorneys that there was no need to prepare for trial in any event, because he intended to plead guilty.

A few days before trial, an attorney with the Equal Justice Initiative contacted Vinson and Warren and told them that he had arranged a life-without-parole plea deal for James. Vinson and Warren contacted the prosecutor, who confirmed that the state would agree to a life sentence if James pleaded guilty before trial.

Shortly after they arrived at court on the scheduled trial date, however, James told Warren that he had changed his mind and wanted to go to trial. Warren warned him that if he went to trial, he would probably be convicted and sentenced

5

to death again, but James said that he did not want to be moved back to the general prison population. James explained that he had it pretty good on death row—he had his own room, his own television that he could control to watch what he wanted, and plenty of reading material. He did not have to worry about being attacked by other prisoners, because he was always one-on-one with the guards. Warren and Vinson both tried to reason with James, but his mind was made up. So the court brought in the jury, and James's trial began immediately.

James's mother and sister surprised Vinson by attending the second day of the two-day trial. Vinson interviewed his sister and asked his mother again about testifying during the penalty phase. His mother declined, and Vinson decided against calling James's sister after she told Vinson stories about violent episodes in James's past, including that he had broken a previous girlfriend's arm, and that he had threatened his stepfather with a gun on the day of the murder. The sister said that James's father had abused him, but when Vinson asked James about it, he denied any abuse.

The jury found James guilty of intentional murder during a first-degree burglary, a capital crime. *See* Ala. Code § 13A-5-40(a)(4) (1975). After the verdict, Vinson spoke with James about the penalty phase. She told him about her interview with his sister, and he became angry that Vinson had spoken to her.

6

Vinson asked James what mitigation evidence she could use for the sentencing proceeding, and he told her none.

The next morning—the day of the penalty-phase proceeding—Vinson spoke with James's mother, stepfather, and sister. James's mother was again unwilling to help. Vinson told James about this conversation and he reemphasized that he did not want anyone to testify in mitigation. He did not want his family to testify, and he did not want to testify himself, either.

James did not offer any mitigating evidence or witnesses during the penalty phase. Warren presented James's penalty-phase argument, arguing that James had reduced culpability because of his age (22 years old at the time of the murder) and emotional immaturity, and that he was under the influence of strong emotions at the time of the shooting.

The jury unanimously recommended a death sentence, and the court sentenced James to death. The Alabama Court of Criminal Appeals affirmed James's conviction and death sentence on direct appeal, and the United States Supreme Court denied his petition for certiorari. *James v. State*, 788 So. 2d 185 (Ala. Crim. App. 2000), *cert. denied*, 532 U.S. 1040 (2001).

## C.

James filed a motion for collateral relief in the Jefferson County circuit court, pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. In his

motion, James argued, among other things, that Vinson and Warren had provided ineffective assistance during the guilt and penalty phases of his second trial, in violation of his Sixth Amendment rights.

At the evidentiary hearing on his Rule 32 motion, James called his maternal aunt, his sister, one of his younger brothers, and his father's former employer to testify, as well as Vinson and Warren.[1]  James's aunt testified that James's mother was sexually promiscuous, often drank to excess, used marijuana, and was generally absent or neglectful when James was growing up.  She abused alcohol when she was pregnant with James, and James was born with an oversized head, small ears, and droopy eyelids that required corrective surgery.  According to James's aunt, his father and mother had an unhappy and violent marriage; his father beat his mother on a weekly basis—while James was in the same room—until his mother left his father when James was about two years old.

After that, James's mother had a new boyfriend almost every week.  She was always out at work or socializing with men, while James, who was the oldest, cared for his five younger brothers and sisters.  James's mother moved with her children to a different house or apartment at least once every year—they lived in 18 different addresses during James's childhood.

---

[1] James also subpoenaed Mara Ruffin to testify at the hearing, but she refused to appear and the state court declined to issue a bench warrant to force her attendance.

James's aunt testified that several of James's relatives on his father's side, including his father, grandfather, aunt, and uncle, all behaved oddly—James's father was antisocial and paranoid, his grandfather believed in magic, his uncle was mentally disabled and aggressive, and his paternal aunt talked to herself. James's father's former employer also testified that he thought James's father was mentally ill, though he was a good employee and a hard worker.

James's sister confirmed that their mother was frequently absent from the home, leaving her and James to care for their siblings, and at one point, leaving all the children with relatives for roughly three years while she moved out of state to pursue a relationship with one of her boyfriends. James's sister did not remember their father well, but family members described him as violent and mentally unstable. She described James as protective of her. She said that she did not remember telling Vinson about incidents of violence in James's past, although she acknowledged that she had heard about those incidents from their mother.

James's brother testified that James visited his mother and stepfather's house on the day of the murder. James was upset because his brother, who was nine or ten years old at the time, had left his bicycle on top of James's clothes. Before James left the house that day, James's brother heard "an altercation" between James and his stepfather.

James also introduced documentary evidence that he contended should have been presented to the jury at his sentencing proceeding or should have led counsel to conduct additional mitigation investigation. This evidence included a police report from several months before the murder indicating that the victim had attacked James and Ruffin by smashing the windshield of their car with a car jack while they sat in a fast-food drive-through. It also included records from two psychological evaluations conducted while James was in prison: a 30-day segregation review in which the evaluator (a licensed psychological counselor) noted that James demonstrated "[s]chizoid characteristics," and a psychometric test score indicating that James might exhibit a thought disorder.[2]

The Alabama circuit court denied collateral relief, and after a complicated procedural course, the Alabama Court of Criminal Appeals affirmed. *See James v. State*, 61 So. 3d 357 (Ala. Crim. App. 2010). In relevant part, the state appellate court concluded that James had not shown that Vinson and Warren had provided ineffective assistance during the guilt or penalty phase of James's trial. *Id.* at 371–78.

---

[2] James also proffered affidavit testimony from two mental health experts stating that these records and James's family history indicated a need for additional psychological testing, and from a "mitigation specialist," criticizing counsel's mitigation investigation. Because these affidavits were not submitted until the evidentiary hearing and the state was unable to respond or prepare counter-affidavits, the state circuit court declined to consider them.

Applying *Strickland v. Washington*, 466 U.S. 668 (1984), the court determined that counsel's performance was not deficient because despite James's lack of cooperation and instructions not to present mitigating evidence, Vinson did some mitigation investigation by interviewing James's mother, grandmother, and sister, and reviewing the competency evaluation completed before James's first trial. *James*, 61 So. 3d at 376–77. The court also found that James could not show that his counsel's failure to gather and present mitigating evidence prejudiced him because (1) he had instructed counsel not to present any mitigating evidence, and (2) in any event, the potential mitigating evidence that James introduced at the Rule 32 evidentiary hearing "was not compelling and would not have affected the verdict if it had been presented at James's sentencing hearing." *Id.* at 376–77, 378.

### D.

James filed a petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254, again arguing in part that Vinson and Warren provided constitutionally ineffective assistance during both phases of his capital murder trial. The district court denied James's habeas petition, finding that the Alabama Court of Criminal Appeals decision was not an unreasonable application of *Strickland*. We granted a

11

certificate of appealability on James's claim that his trial counsel provided ineffective assistance during the penalty phase.[3]

## II.  STANDARD OF REVIEW

We review a district court's ruling on a petition for habeas corpus relief de novo.  *See Cummings v. Sec'y for the Dep't of Corr.*, 588 F.3d 1331, 1355 (11th Cir. 2009).  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we are prohibited from granting a state prisoner's habeas corpus petition unless the relevant state court decision on the merits of the petitioner's claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)–(2).

A decision is "contrary to" clearly established federal law if the state court applied a rule that contradicts governing Supreme Court precedent, or if it reached a different conclusion than the Supreme Court did in a case involving materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  A state court decision involves an "unreasonable application" of clearly established federal

---

[3] Our review is limited to the issue specified in our certificate of appealability.  *See, e.g.*, *Williams v. Allen*, 598 F.3d 778, 795 (11th Cir. 2010).  We therefore decline to address James's argument that the district court should have held an evidentiary hearing before ruling on his § 2254 petition.

law if the court identifies the correct legal principle but applies it unreasonably to the facts before it. *Id.* "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "A state court's application of clearly established federal law or its determination of the facts is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion." *McNabb v. Comm'r Alabama Dep't of Corr.*, 727 F.3d 1334, 1339 (11th Cir. 2013) (citation omitted).

## III.  DISCUSSION

James's ineffective assistance of counsel claim is governed by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Premo v. Moore*, 562 U.S. 115, 118 (2011). Under *Strickland*, a petitioner claiming that he received ineffective assistance of counsel in violation of the Sixth Amendment must show both that his attorney's performance was objectively unreasonable "under prevailing professional norms" and that counsel's poor showing prejudiced his defense. *Strickland*, 466 U.S. at 687–88. The petitioner bears the burden of proving his ineffective assistance claim, and he must meet his burden on both prongs to succeed. *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010). We "need not address the performance prong if the defendant cannot meet the

13

prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (internal citation omitted).

The Supreme Court has cautioned that the "object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. That is the case here. Accordingly, we decline James's invitation to evaluate his counsel's mitigation investigation—charitably described by the state court as "limited"—and move instead to the prejudice prong of the *Strickland* analysis.

To show prejudice under *Strickland*, James "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A petitioner alleging that his counsel was ineffective for failing to discover and present mitigating evidence during the penalty phase of his capital murder trial must show that, absent counsel's errors, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. This requires a preliminary showing that the jury would actually have heard helpful evidence during the penalty phase if his attorneys had discovered it—if the petitioner would not have allowed his counsel to present mitigating

14

evidence at sentencing, then he "was not prejudiced by anything that trial counsel did." *Gilreath v. Head*, 234 F.3d 547, 551 n.12 (11th Cir. 2000); *see Landrigan*, 550 U.S. at 477.

So a petitioner who instructed his counsel not to present mitigating evidence at sentencing must make two showings to meet the prejudice prong of the *Strickland* test. As a threshold matter, he "must show a reasonable probability that, if he had been more fully advised about the mitigating evidence and its significance, he would have permitted trial counsel to present the evidence at sentencing." *Pope v. Sec'y, Florida Dep't of Corr.*, 752 F.3d 1254, 1266 (11th Cir. 2014); *see Gilreath*, 234 F.3d at 551 & n.12. If he makes this showing, he must then establish a reasonable probability that if the jury had heard his proffered mitigating evidence, it would have recommended life instead of death. *Pope*, 752 F.3d at 1266.

James focuses on this secondary showing, arguing that the mitigation evidence he presented at the Rule 32 hearing would have given the jury a completely different impression of him and his relationship with the victim. But James has not presented any evidence showing that he would have permitted his counsel to introduce mitigation evidence at sentencing, even if they had collected any. We need go no further to conclude that he cannot prove prejudice under *Strickland*; as we have explained before, "there cannot be a reasonable probability

15

of a different result if the defendant would have refused to permit the introduction of mitigation evidence in any event." *Cummings*, 588 F.3d at 1360.

James also argues that the Alabama circuit court's finding that he instructed counsel not to present any mitigating evidence during the penalty phase was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Specifically, he contends that Vinson's testimony to that effect was not credible because other parts of her testimony—her affidavit statements that James refused to talk to her about the murder or provide information about his family—were contradicted by her hand-written notes. That inconsistency, James says, shows that Vinson was lying in an attempt to blame him for her failure to gather mitigation evidence.

But regardless of inconsistencies on other issues, Vinson's testimony that James told her not to call any mitigation witnesses is wholly consistent with other evidence in the record. For example, her contemporaneous notes state that James became angry when he learned that she had spoken with his mother and sister about testifying during the penalty phase, and that when she asked him what mitigation evidence she could use, "he said none." Moreover, Warren—whose testimony is uncontradicted—testified that James told Vinson not to call his family to testify on his behalf at the penalty phase.

16

Importantly, Warren also testified that James clearly expressed his preference for a death sentence, explaining that he would much rather spend 10 or 12 (or, as it turns out, more than 20) years on death row, where he was comfortable and had plenty of reading material and his own television, than be sentenced to spend life without parole in the general prison population. James rejected the state's offer of a life sentence in exchange for his guilty plea, although he knew that the case against him was strong—Warren specifically advised him that if he rejected the plea offer and went to trial, he probably would be found guilty and sentenced to death again. If James's goal was to remain on death row, permitting his attorneys to introduce mitigation evidence would have been counterproductive. The state court's finding that James instructed his counsel not to put on mitigation evidence was not an unreasonable determination of the facts.

And James has not shown that he would have changed his mind if his attorneys had had more mitigation evidence to offer. Indeed, no evidence in the record shows that he would have done so. He himself has never made such a statement—he did not testify on his own behalf during the sentencing proceeding, and when the trial judge asked whether he agreed with the decision not to present any witnesses in mitigation, he simply nodded his agreement. Nor did he testify during the state collateral proceedings, either at the evidentiary hearing (where he appeared by telephone) or by deposition or affidavit. Without any evidence that he

17

would have agreed to let it in, James cannot show that helpful mitigation evidence would have been heard by the jury even if his counsel's performance had been beyond reproach—much less that there was a reasonable probability that the evidence he proffered would have convinced the jury to recommend life rather than death.

*    *    *

To succeed on his ineffective assistance of counsel claim, James was required to affirmatively prove that his counsel's allegedly deficient performance prejudiced him.  In the circumstances shown here, proof of prejudice requires some evidence that if counsel had discovered the evidence he now proffers, he would have permitted them to present it during the penalty phase proceedings.  Because James has not produced any such evidence, we conclude that the Alabama Court of Criminal Appeals reasonably applied *Strickland v. Washington* in rejecting James's ineffective assistance of counsel claim.  We therefore affirm the district court's denial of James's § 2254 petition.

**AFFIRMED.**