Appellant, Jessie Ruth Jones, was convicted, after a jury trial, of murder in violation of § 13A-6-2, Code of Alabama 1975, and was sentenced to 40 years' imprisonment. She appeals, raising one issue.
The evidence disclosed that, on November 20, 1987, appellant and the victim, Richard Powell, were living together in appellant's home. The victim had been staying in appellant's home "off and on" for about *Page 776 
six months. Their relationship had been stormy and was punctuated by frequent arguments and altercations. On said date, appellant ordered the victim to vacate her premises. After some argument, she placed the victim's clothing in a bag and put it on the front porch. Appellant decided to go to the local courthouse for the purpose of obtaining a "warrant" for her protection. As she was driving away from her home in her automobile, the victim threw a brick or other heavy object, which struck her automobile. She stopped and fired two shots from her pistol at the victim as he ran away. She customarily carried a pistol for her "protection." Before reaching the courthouse, appellant telephoned her home to see if anything had occurred and was advised by her sister that the victim had broken into her bedroom and destroyed her television set, video cassette recorder, and record player. She returned home immediately and was advised by the police to obtain a warrant for the victim's arrest for the destruction of her property. She went to the courthouse, made arrangements for the warrant, and returned home. Shortly thereafter, the victim telephoned appellant and, according to her, said that he was "coming over" and was going to kill her. A short time later the victim arrived and entered the home. Appellant met him in the hallway. She was armed with a pistol. She testified that the victim stated "you ain't gonna get to it now," and turned "like maybe to get something" from his pocket, and that she shot him in the chest. The victim fell, and she testified that he moved like he was "reaching up at me," and she fired two more shots into the victim. One bullet entered his back and one entered his side. He died in a matter of minutes.
Appellant testified in her own behalf. She claimed that she shot the victim in defense of herself, but did not intend to kill him.
Appellant's sole contention on appeal is that the trial court committed reversible error in admitting, over timely objections, the testimony of Joyce McKitt and Mary Powell, the sister and mother of the deceased, relating declarations made by the deceased to them several hours prior to the shooting. We agree. The testimony was hearsay. Its admission was clearly erroneous. The pertinent portion of the record shows the following testimony by McKitt:
 "Q. BY MR. VICKERS [prosecutor]: If you would, tell the ladies and gentlemen of the jury your name, please, ma'am.
"A. Joyce Lindawese McKitt.
". . . .
"Q. . . . Are you related to Richard Powell?
"A. Yes, sir.
"Q. How are you related?
"A. I'm his sister.
 "Q. . . . [W]hen was the first time that you talked to your brother on November 20th?
 "A. It was between 8:00 and before 9:00 o'clock Friday evening.
"Q. Where did you talk to him?
"A. I was at home, and he was at my mother's.
"Q. How do you know he was at your mother's?
 "A. Because I had just finished talking to my mother, and he called me back. He wanted to know if —
 "MR. SMITH [Defense counsel]: We object to anything he said, Your Honor, that the defendant wasn't present or heard the conversation.
 "THE COURT: Y'all approach the Bench, please. (WHEREUPON, counsel approached the Bench and the following discussion was held between Court and counsel which was out of the hearing of the jury.)
"THE COURT: You intend to offer statements?
 "MR. VICKERS: Correct, Your Honor. What their conversation was two and a half hours to three hours prior to the shooting. But we contend it's part of the res gestae.
"THE COURT: Of Richard Powell?
"MR. VICKERS: Right.
"MR. SMITH: I object to that.
 "THE COURT: It would be admissible under the exception to the hearsay rule. *Page 777 
 "MR. SMITH: Well, I object to it, Your Honor. I don't think so. . . .
". . . .
 "THE COURT: I'm going to allow it as an exception to the hearsay rule.
"MR. SMITH: We'd except, Your Honor.
". . . .
 "(WHEREUPON, counsel returned to open court and the following proceedings occurred in the hearing and presence of the jury.)
 "Q. (BY MR. VICKERS:) Ms. McKitt, what did he say to you on the phone at that time?
 "A. Well, the first thing he asked me, did I talk to Jessie.
"Q. The defendant?
"A. (Witness nods head affirmatively.)
"Q. Okay. What did you say?
"A. I asked him why.
"Q. Okay.
"A. And he say cause I got to know —
 "MR. SMITH: Your Honor, we object to this. This is not the exception to the hearsay rule as you explained to me for the purpose of destination or journey.
 "THE COURT: No. I'm going to allow him to go into the content of the conversation. Overruled.
"Q. (BY MR. VICKERS:) You may answer.
". . . .
 "A. . . . He say he just wanted to know did I talk to her. So I asked him what was he doing. And then I asked him why did he run from the police. He told me he didn't do anything. He say he ran because he was scared. He say, I didn't do anything. So I say, if you didn't do anything, why did you run? He said, because it was no telling what Jessie could have told the police on me, and I don't want to be in jail for the rest of the weekend. So I told him, I say, just don't go over there. He said, well, let me tell you what happened. So I told him, I don't want to hear it, just don't go back over there because something may happen. So then he said — Well, he kept saying let me tell you what happened. He said, it started Wednesday over plumbing. He say, Jessie Ruth always fusses at him and says he can't do anything. So he called my mother. They needed a plumber. He called my mother to get the name of a plumber. He say he talked to Mama. He went over and —
 "MR. SMITH: Your Honor, we object to this. Now, it's hearsay as far as what he's saying. Now she's telling what Mama told him that he told her. And we would object to this conversation.
 "THE COURT: Yeah. I'm going to sustain the objections to the mother's statement.
 "Q. Okay. What did he tell you that he did on Wednesday?
 "A. He say after he got back to Jessie's house she had one of her old boyfriends over there. He say, and she just started getting off on me. He say, and I didn't want to hear it because me and the guy had a run-in once before. So he say he asked her, Jessie Ruth, why do you have him over here? Then he say, ever since that Wednesday she was just picking, just starting little stuff ever since that Wednesday. He said that Friday she had put his clothes out on the street. She had a knife and she had a gun at him. And I told him, I say, just stay at home, don't go back over there. So he say, I'm not going back over there. He say, see, Joyce, she's used to fighting with her other boyfriends. He say she had her foot broke once. He said, and I don't fight with her. He said, we was in the bed — he said, because I get off work at 5:00 o'clock on Friday. We was laying in the bed. He say Jessie Ruth wanted him to rub her feet. He say he told her he was tired. He say his hands was tired and he didn't want to rub her feet. So he said she just got off and slapped him.
". . . .
 "Q. On November 20th, did you discuss with them their problems?
"A. Their problems?
"Q. On that evening?
 "A. Well, the only thing he talked to me about that evening, he told me how she always down him, how she, you know, talked down on him. He say how he was *Page 778 
tired of it. He say about the run-in with the boyfriend. She slapped him. He wasn't going to take it anymore. He wasn't going back over there. He was going to stay away from her. Things like that. But besides the plumber and the gun that Friday and the knife, you know, he didn't go into nothing about the other part of the relationship."
The pertinent portion of Powell's testimony was as follows:
 "Q. [MR. VICKERS]: Mrs. Powell, I need to ask you some tough questions. I know it will be difficult, but I want you to just answer as best as you can. Okay?
"A. Yes, sir.
"Q. Did you have a son named Richard Powell?
"A. Yes, I did.
"Q. Did he die on November 20th, 1987?
"A. Yes, he did.
". . . .
 "Q. Do you recall talking to him on the day he died?
"A. Yes.
"Q. When did you first talk to him?
 "A. Well, I talked to him after 6:30 or something like about something to 7:00 or something he called me.
"Q. Do you know where he called you from?
"A. From Jessie Ruth's house.
". . . .
"Q. What did he tell you when he called?
"MR. SMITH: Objection, Your Honor. Hearsay.
 "THE COURT: Lay a predicate to the time, if you have a best estimate as to the time, Mr. Vickers.
"Q. Was this on November 20th?
"A. Yes, sir.
 "Q. Was it on the evening of November 20th, the same evening he died?
"A. Yes, sir.
"Q. And about what time did you say it was?
 "A. Well, it was after 6:30, so I really don't know exactly the time.
". . . .
"Q. What did he say when he called?
"MR. SMITH: Again, objection, Your Honor.
"THE COURT: I'll overrule the objection.
"Q. You may answer.
 "A. He called me and he say — he seemed like he was crying. And he called me, he said, Mama, come over here and get me. I asked him what was the matter. He said, just come and get me. Said, Jessie Ruth is raising sand. Said, she got a butcher knife in one hand and a pistol in the other one. And told me to come get him. So I told him all right. So in a few minutes he called me back again. He said, Mama, come on over here and get me, come on get me right now. And I told him all right. I stopped everything I was doing and I went to get him."
"A statement made by the victim of a crime is ordinarily hearsay and inadmissible, unless it constitutes a recognized exception such as res gestae, a dying declaration, a threat, a declaration as to state of mind made by a victim upon his departure to meet the defendant, or a complaint in connection with a sex crime." C. Torcia, Wharton's Criminal Evidence§ 260 (14th ed. 1986). "Statements and declarations of a deceased are not competent evidence for or against an accused in a murder prosecution unless made in his presence, or unless they are admitted in evidence as part of the res gestae or constitute dying declarations." Lovett v. State, 491 So.2d 1034
(Ala.Cr.App.), cert. denied, 491 So.2d 1039 (Ala. 1986) (quoting from Hargrove v. State, 368 So.2d 335, 337
(Ala.Cr.App. 1979)). See also Holland v. State, 162 Ala. 5,50 So. 215 (1909).
The state argues that the statements and declarations of the deceased, as related by his sister and mother as set out above, constituted a part of the res gestae of the crime, and thus were admissible in evidence as exceptions to the hearsay rule. We do not agree. "Utterances made before the occurrence of the main fact may be admissible as part of the res gestae, if made as a *Page 779 
part of the principal transaction, in reference to or in contemplation of it, or if it tends to explain the intent, motive, or purpose of the declarant." R. Williams,Williams' Alabama Evidence§ 141 (1967). "'To be admissible as res gestae, the declaration of a deceased person must have been made at such a time and under such circumstances as to be a part of the transaction which [it purports] to explain. . . .'"Lovett v. State, 491 So.2d at 1036.
We find an excellent definition of the res gestae principle in Harrison v. Baker, 260 Ala. 488, 493, 71 So.2d 284, 288-89
(1954), wherein the Alabama Supreme Court, quoting from AlabamaG.S.R. Co. v. Hawk, 72 Ala. 112, 117 (1882), stated as follows:
 "'It is commonly said to have reference to such circumstances and declarations as are contemporaneous with the main fact under consideration, and so closely connected with it as to illustrate its character. 1 Greenl. Ev. § 108. What lapse of time is embraced in the word "contemporaneous" is often a question of difficulty. Perfect coincidence of time between the declaration and the main fact is not, of course, required. . . . The declaration must, however, be so proximate in point of time as to grow out of, elucidate, and explain the character and quality of the main fact, and must be so closely connected with it as to virtually constitute but one entire transaction, and to receive support and credit from the principal act sought to be thus elucidated and explained. The evidence offered must not have the earmarks of a device, or afterthought, nor be merely narrative of a transaction which is really and substantially past.'"
In the instant case, the testimony, relating statements or declarations made by the deceased several hours prior to the shooting was clearly inadmissible hearsay and, its admission in this case constituted reversible error. The declarations of the deceased were not so connected with the incident or transaction as to be a part of it or, as we say, a part of the res gestae. They were not connected to the crime, nor to some relevant or connected transaction, and did not form a part of it. His narrative concerning his relationship with appellant and the events that had occurred up to the time of his conversations with his sister and mother were not connected with the shooting, nor were they in contemplation of it. They do not explain or elucidate it. The declarations are narratives of past transactions and are lacking in spontaneity.
We have reviewed the entire evidence in the case and conclude that we cannot dismiss the inadmissible evidence as harmless or cumulative. The inadmissible testimony was damaging to appellant, since it cast her as an aggressor and a person prone to violence, and it tended to undermine and discredit her theory of self defense. While it could be said that some of the declarations were cumulative of other testimony properly admitted, such as that regarding appellant's threatening the deceased with a gun and shooting at him on two occasions, the bulk of the damaging testimony was not. Appellant admitted that she had shot at the deceased on two occasions prior to the fatal incident; however, the testimony relating that appellant had threatened the deceased with a knife and had slapped him and was generally abusive toward him was clearly not cumulative of other evidence. While the initial determination of whether a statement is within the realm of a res gestae declaration and admissible as such is a matter within the discretion of the trial court, Jasper Coca-cola Bottling Co. v. Roberts, 47 Ala. App. 219, 252 So.2d 428 (Ala.Civ.App. 1971); Harrison v.Baker, supra; C. Gamble, McElroy's Alabama Evidence§ 265.01(2) (3d ed. 1977), we find here that the trial court abused its discretion in admitting the hearsay testimony.
For these reasons, the judgment of the trial court is hereby reversed and the case is remanded.
REVERSED AND REMANDED.
All Judges concur. *Page 780