906 So.2d 277 (2004)
Ex parte Bobby BAKER, Jr.
(In re Bobby Baker, Jr.
v.
State of Alabama).
1000999.
Supreme Court of Alabama.
May 28, 2004.
Rehearing Denied August 20, 2004.
*278 Cathleen I. Price of Equal Justice Initiative of Alabama, Montgomery, for petitioner.
William H. Pryor, Jr., atty. gen., and Beth Jackson Hughes, asst. atty. gen., for respondent.
JOHNSTONE, Justice.
Bobby Baker, Jr., was indicted for and convicted of assault in the first degree, a violation of § 13A-6-20, Ala.Code 1975; discharging a weapon into an occupied dwelling, a violation of § 13A-11-61, Ala. Code 1975; and capital murder in intentionally murdering Tracy Baker in the course of kidnapping her, a violation of § 13A-5-40(a)(1), Ala.Code 1975. After a sentencing hearing, in a 10 to 2 vote, the jury returned an advisory verdict of death for the capital murder. The trial court sentenced Baker to death on the capital-murder conviction, to life imprisonment on the first-degree-assault conviction, and to life imprisonment on the discharging-a-weapon-into-an-occupied-dwelling conviction. Baker appealed his convictions and sentences, and the Court of Criminal Appeals affirmed. Baker v. State, 906 So.2d 210 (Ala.Crim.App.2001).
Baker petitioned this Court for a writ of certiorari to review the capital murder conviction. This Court granted the petition to address, among other issues, the admissibility of evidence of six prior incidents of domestic violence purportedly committed by Baker against his wife, the homicide victim, and the prejudice resulting from the admission of the evidence. We reverse and remand for a new trial.
The facts of the case were summarized by the trial judge in his sentencing order and were adopted by the Court of Criminal Appeals in their published opinion affirming the judgment of the trial court, 906 So.2d at 221-24:
"`On October 18, 1991, Bobby Baker, Jr., and Tracy Nesia Wynn were married in Houston County, Alabama. Right after their marriage, and in fact, on November 17, 1993, domestic problems surfaced in their marriage. In every incident reported, and there were at least seven such incidences, Baker was reported to have assaulted his wife, harassed her, on one occasion rammed the car she was riding in, and on another occasion held her against her will for approximately one week.
"`On the date of this offense, which was April 5, 1994, Baker and his wife had apparently been separated for some time. Earlier in the day on the date of this offense, Tracy Baker was at a residence on Short Atlanta Street in Dothan with some friends. One of those friends happened to be a male acquaintance who she had been talking with and, apparently, her husband, Bobby Baker, was aware of this. As Baker's wife and these other friends were leaving this residence, Baker became involved in an altercation with this male friend of his wife. According to witness' accounts Baker assaulted this male and threatened to kill him for his involvement with *279 his wife. However, Baker and this male were separated at that time and both went their separate ways.
"`According to statements obtained by police, Ezederick Eady and Bobby Baker were riding around in Baker's car after the altercation. Eady stated that Baker was very upset with his wife and that he made statements indicating that he was going to hurt her and anyone that had been involved with her. While Baker and Eady were riding around, they picked up another friend, Byron Johnson. Statements from Eady and Johnson indicated that Baker was inquiring as to where he could buy a firearm that night. Sometime during the early part of the evening, Baker went to a residence located on Enterprise Street and obtained what was described as a long weapon that was wrapped in some type of cloth.
"`Baker, Eady, and Johnson were riding in Baker's car and Eady was driving the vehicle. It was reported that Baker directed Eady to drive this vehicle to the residence of Sharon1 Walker who was a cousin of his wife, Tracy Baker. Eady drove this vehicle to Walker's residence at 727 Hutchins Street in Dothan and Baker exited the vehicle with this firearm. Witness' accounts indicate that Baker approached the residence and became engaged in a conversation with Sharion Walker. Baker was inquiring as to the whereabouts of Tracy, and Sharion Walker kept telling Baker she did not know where she was. Baker made several threats towards Walker if she did not cooperate with him, and when it appeared she was not going to cooperate, he raised what is described as a AK-47 assault rifle towards Walker's residence and fired through the front door. A number of people were in this residence at the time Baker fired through the front door, including Walker's children as well as Tracy Baker. Baker entered the residence after firing through the front door and a short time thereafter found his wife, Tracy, hiding in one of the rooms. He forced her along with Sharion Walker to leave the residence telling them that they were going with him and he was going to talk to his wife. Johnson and Eady, who were waiting in the car, were initially told by Baker to leave and to come back and pick him up later. However, when they heard the shooting they returned to the scene and were waiting for Baker. Baker came to the vehicle with Tracy and Sharion Walker and ordered both of them to get in the vehicle. Tracy Baker kept telling her husband that she was not going with him, and she knew that he was going to kill her if she did. Sharion Walker kept telling Baker that she did not want to leave her children at home alone, and that she did not want to go with him either. However, Baker forced his wife into the vehicle and, at that point, Sharion Walker refused to get into the vehicle. Baker raised the assault rifle and fired what is believed to be two shots at Sharion Walker hitting her in both legs. At that point, Baker got into the backseat of his vehicle with his wife and ordered Eady to drive away.
"`Eady drove the vehicle a short distance away to the dead end of Enterprise Street where he stopped the vehicle. Both Johnson and Eady stated that Baker was continuously arguing with his wife and at times pointing the gun in various directions. Baker was telling Tracy during the ride that he was going to kill everyone who ever had anything to do with her. He also stated that all he wanted to do was to talk to her. When the car stopped on Enterprise Street, Baker got out of the car holding *280 the rifle. He ordered Tracy to get out of the car but she refused stating that she knew he was going to kill her. Tracy Baker asked Eady several times to drive off while Baker was outside of the vehicle but he did not do so. When Tracy continued to refuse to exit the vehicle, he pointed the rifle into the car towards Tracy Baker and began firing. The autopsy report reveals that Tracy Baker was hit five times with bullets from the AK-47 assault rifle that Baker was firing in her direction. When Baker began shooting, both Johnson and Eady began running from the vehicle. One round from the assault rifle hit Eady in the chest area and he ran a short distance from the vehicle before he fell down. Residents who live in the area of Enterprise Street and Terrell Street also heard and saw the shooting and police responded to both this scene as well as the shooting of Walker on Hutchins Street. Both Eady and Johnson report seeing Baker flee the scene after the shooting and neither had any further contact with him.
"`Police who responded to the scene of the shooting of Sharion Walker on Hutchins Street were advised by Walker that Bobby Baker had been the one who had committed the assault on her and had abducted his wife, Tracy. Police were also dispatched to the scene of the shooting at Enterprise Street and Terrell Street where Tracy Baker had been shot. Police recovered the assault rifle that Baker dropped as he fled the scene of the shooting. A look-out was posted for Baker and it was not until the following day that Baker was located when he turned himself in at the police department.
"`On April 6, 1994, at approximately 11:00 a.m., Baker was advised of his rights by police investigators and gave a statement. Initially he stated that he had gone to the house on Hutchins Street and had fired into it with a .22 caliber rifle. He denied any knowledge of a SKS7.62 assault rifle. He also stated that Tracy got into the vehicle of her own free will and it was at that point that he noticed some people coming after them in a white car. He stated that he [sic (she?)] and Johnson jumped out of the vehicle on Enterprise Street and left Eady and Baker in the car and he denied shooting his wife stating that those people who were following them must have done it. After being confronted with a statement given by Johnson, Baker then advised that he would tell investigators the truth. He stated that Eady and Johnson rented the assault rifle from Donnie Flournoy for $200 worth of base cocaine. He further stated that Eady drove him to Sharion Walker's house where he confronted Walker and then fired the rifle through the storm door demanding to know where his wife was. After finding Tracy in the residence, he says that Tracy got into the vehicle and that after arguing with Sharion Walker, he fired the weapon, but did not know he had hit her. After driving off with his wife in the vehicle, and stopping on Enterprise Street, he stated that he did not mean to kill her but that he shot into the car just trying to scare her. Baker admitted to arguing with his wife, ordering her to get out of the car and also hearing her tell him she would not get in because she knew he was going to kill her. Baker stated that he got out of the car and started shooting. Baker was initially arrested by police and charged with Assault I and Discharging a Gun Into an Occupied Building. Later he was charged with Capital Murder in regards to the shooting of Tracy Baker.'

*281 "1 Although this order and several other documents in the record refer to this victim as `Sharon,' the indictment and this victim's testimony identify her as `Sharion.' Throughout this opinion, we have used the name `Sharion.'"
At trial, at the very beginning of the case in chief of the State, the trial court allowed the defendant a continuing objection but allowed the State, over the continuing objection, to introduce the testimony about six incidents prior to the date of Tracy's death.
Dothan Police Officer Albert Riley testified that he interviewed Tracy and made a report of the interview on November 17, 1993 at 913 Houston Street. He testified that she, describing what she said the defendant had done to her, said as follows:
"A. She stated she was on the telephone, and he told her to get off. And when she refused, he hit her on the left side of the face with his fist. And she dropped the phone. He picked the phone up and struck her on the right side of the face with the telephone receiver."
Officer Riley testified that he observed that "[h]er left eye was bruised and starting to swell." Officer Riley further testified that the defendant was not "there" at the time of the interview.
Dothan Police Officer Brian Smith testified that he interviewed Tracy and made a report of the interview on December 12, 1993 at 913 Houston Street. He testified that she, describing what she said the defendant had done to her, said as follows:
"A. She said they had been at the Waffle House, had driven up to the Waffle House. And they gotten into an argument. And during the course of the argument, he reached over  he was on the driver's side. She was on the passenger. He reached over and had hit her in the left temple area."
Officer Smith testified that he observed that her face was swollen "[r]ight around the temple and the eye area." Although Officer Smith implied that the defendant was present at the residence, Officer Smith did not testify that the defendant was present where Officer Smith was interviewing Tracy outside the residence.
Dothan Police Officer Andy Martin testified that, on January 25, 1994, he interviewed Tracy and made a report of the interview. He testified that she, describing what she said the defendant had done to her, "just said he had hit her in her left eye with his fist." Officer Martin testified that he observed that Tracy's "left eye was swollen, like real puffy." Officer Martin further testified that the defendant was not present.
Dothan Police Officer Adrian Woodruff testified that, on February 11, 1994, she interviewed Tracy and made a report of that interview. Officer Woodruff testified that Tracy, describing what she said the defendant had done to her, said as follows:
"A. She said he picked her up in his car, told her that he wanted to talk to her. She got into the car. They were driving around. They then went to the Citgo station that's located on Ross Clark Circle at East Main. It's on the corner there. She said he stopped the car. He went  and said he was going to go inside and buy some duct tape to tie her up.
"....
"A. She jumped out of the car. She saw a pickup truck that was in the parking lot. She ran over and jumped in the pickup truck. It had a man sitting in it, and told him to go in and call the police, that she wasn't getting out of the truck until the police got there."
Officer Woodruff further testified that she arrived on the scene (the Citgo station) while Tracy was still in the pickup truck. *282 Officer Woodruff testified that Tracy said "she was afraid [the defendant] was going to kill her." Officer Woodruff testified that the defendant was not "present at that time." Officer Woodruff testified that Tracy did not "have any injuries that [Officer Woodruff] recall[ed]."
Dothan Police Officer Albert Riley, having been recalled by the State, testified that, on May 17, 1994 (sic, over a month after Tracy was killed) at a Mona Drive address, he again interviewed Tracy and made a report on that interview. He testified that she, describing what she said the defendant had done to her, said:
"A. She said that her and Bobby were in an argument. And when she tried to leave, he took a cord, an electrical cord from a curling iron, and tied her feet together and tied her hands together with an electrical extension cord and locked her in the closet. Any time she would try to talk to him or argue with him or yell for help, he would take a plastic garbage bag and place it over her head so she couldn't be heard."
On cross-examination by the defendant, Officer Riley testified that he did not see the electrical cord, the plastic bag, or any type of injury.
Darlene Riggins, one of Tracy's friends, testified that, on or about March 22, 1994, while she and Tracy were going to Tracy and the defendant's house on Houston Street to get Tracy's clothes, Tracy said that the defendant had "put plastic over head[,] ... tied her up, and ... choked her." Ms. Riggins further testified that Tracy had said that her being tied up prevented her from going to court to testify against the defendant on "a warrant [Tracy had] with the City of Dothan on [the defendant] at that time."
Ms. Riggins further testified as an eyewitness to the defendant's conduct toward her and Tracy on the same March 22, 1994 date, beginning as they were driving to Tracy and the defendant's house to get Tracy's clothes. The defendant, driving another car, followed them, drove the side of his car against the side of theirs to stop them, "opened the car door on [Tracy's] side, and ... grabbed her arms." Ms. Riggins
"grabbed [Tracy] around the waist. And he saw that he couldn't get her. So he decided to let her go, and he left. He fled from the scene."
Ms. Riggins testified that Tracy was screaming.
Sharion Walker, the victim of the defendant's assault, and one of Tracy's friends, testified that, at some time unspecified in her testimony, Tracy had said that the defendant had tied her up and had put plastic over her face. Ms. Walker testified further that Tracy had said the defendant had beaten her. Ms. Walker testified that, at the time Tracy had said the defendant had beaten her, Tracy had showed Ms. Walker "some black marks on [Tracy's] back."
The capital kidnap-murder indictment in this case reads:
"The grand jury of said county charge that, before the finding of the indictment, Bobby Baker, Jr. whose name is otherwise unknown to the Grand Jury, did intentionally cause the death of Tracy Baker by shooting her with a gun and Bobby Baker, Jr. caused said death during Bobby Baker Jr.'s abduction of, or attempt to abduct Tracy Baker with intent to terrorize her, in violation of 13A-5-40(a)(1), of the Code of Alabama, against the peace and dignity of the State of Alabama." (Emphasis added.)
Rule 401, Ala. R. Evid., defines "relevant evidence":
"`Relevant evidence' means evidence having any tendency to make the existence *283 of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
Rule 402, Ala. R. Evid., provides that
"[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible." (Emphasis added.)
Rule 801(c), Ala. R. Evid., reads:
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
Rule 802, Ala. R. Evid., provides that
"[h]earsay is not admissible except as provided by these rules, or by other rules adopted by the Supreme Court of Alabama or by statute."
We first recognize the admissibility, for a limited purpose, of Officer Woodruff's testimony that Tracy had said that "she was afraid [the defendant] was going to kill her." The defendant, in his statement to the police, said that Tracy had accompanied him on the fatal car ride of her own free will. The defense insisted on this contention by eliciting testimony to like effect from the driver Ezederick Eady. This contention accentuated Tracy's own state of mind  her will  as an issue material to the abduction element of the kidnap-murder charge. See § 13A-6-40(1), § 13A-6-40(2), and § 13A-6-43(a)(5), Ala. Code 1975 (restriction of victim's movement "without [victim's] consent" is an essential element of abduction, which is an essential element of kidnapping in the first degree). Tracy's fear  whether based on fact, fiction, or fantasy  that the defendant "was going to kill her" tended to prove that she did not accompany the defendant on the fatal ride of her own free will, or by consent. Therefore, Officer Woodruff's testimony to Tracy's out-of-court declaration of her state of mind  her fear  was relevant to a material issue in the case  the victim's-will element of the abduction element, §§ 13A-6-40(1) and (2), of the kidnap element, § 13A-6-43(a)(5), of the capital murder charge, § 13A-5-40(a)(1).
Rule 803(3), Ala. R. Evid., one of the exceptions to the hearsay rule, reads:
"A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily heath), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." (Emphasis added.)
Therefore Rule 803(3) together with Rule 402 ("relevant evidence is admissible") allowed Officer Woodruff's testimony to Tracy's out-of-court declaration that "[s]he was afraid [the defendant] was going to kill her" as "[a] statement of the declarant's then existing state of mind" although not as a statement that the defendant would, in fact, kill her. Because the identity of the defendant as the assailant in this case is absolutely uncontested, the feature of this out-of-court declaration that would otherwise tend to identify the defendant as the assailant and thereby to violate the provision of Rule 803(3) disallowing statements of belief (see Justice Lyons's special writing to the plurality opinion in Ex parte Dunaway, 746 So.2d 1042, 1048 (Ala.1999), and see also Lovett v. State, 491 So.2d 1034, 1038 (Ala.Crim.App.1986)) and Rule 704, Ala. R. Evid., disallowing opinions "embrac[ing] an ultimate issue ... of *284 fact," could cause no prejudice and therefore requires no further discussion.
We now address the testimony by the witnesses for the State insofar as it purported to recount Tracy's out-of-court declarations purporting to describe acts of domestic violence against her by the defendant. Intent to terrorize Tracy was an essential element of the capital kidnap-murder as charged in the indictment against the defendant in the case now before us. See § 13A-6-43(a)(5) and § 13A-5-40(a)(1), Ala.Code 1975. The defendant also contested this essential element and accentuated it as an issue. Because recent acts of domestic violence by the defendant against Tracy would have tended to prove an ongoing process of terrorizing her in order to control her which culminated in the events on the day of her death, evidence of such incidents, if not otherwise inadmissible, was and would have been relevant to the contested issue of the defendant's intent to terrorize Tracy.
The critical issues, however, are whether certain testimony admitted to prove such incidents over the defendant's continuing objection was, while relevant, otherwise inadmissible, Rule 402, and prejudicial. Citing Jones v. State, 570 So.2d 775, 778 (Ala.Crim.App.1990), Laney v. State, 643 So.2d 1024 (Ala.Crim.App.1994), and James v. State, 723 So.2d 776 (Ala.Crim. App.1998), the Court of Criminal Appeals correctly held that the witnesses' testimony, insofar as it purported to recount Tracy's out-of-court declarations purporting to describe acts of domestic violence against her by the defendant, was inadmissible hearsay. Baker v. State, 906 So.2d at 238-44. The Court of Criminal Appeals, however, invoked the harmless error rule to excuse the error by the trial court in admitting this hearsay. The Court of Criminal Appeals said that the error was harmless because the hearsay was reliable and that the hearsay was reliable because the facts stated in Tracy's out-of-court declarations were corroborated by certain other evidence in the case. The Court of Criminal Appeals held that this corroboration supplied "a guarantee of trustworthiness and indicia of reliability" to the inadmissible hearsay. Baker, 906 So.2d at 243. This rationale by that court is invalid for six reasons.
First, the harmless error rule excuses the error of admitting inadmissible evidence only because the evidence was so innocuous or cumulative that it could not have contributed substantially to the adverse verdict, Ex parte Curtis, 502 So.2d 833 (Ala.1986), and Ex parte Bush, 474 So.2d 168 (Ala.1985), not because the inadmissible evidence was reliable. If evidence be not only inadmissible but also reliable, its very reliability increases the likelihood of an effect on the verdict adverse to the defendant and thereby, to that extent, diminishes the applicability of the harmless error rule. If reliability were a criterion for harmlessness, the erroneous admission of illegally seized narcotics, for example, would nearly always be harmless per se.
Second, reliance on the reliability of inadmissible hearsay to excuse its admission is the same, in net effect, as a caselaw adoption of the residual hearsay exception to the hearsay rule in defiance of the rejection of this exception by the Alabama Supreme Court in its order adopting the Alabama Rules of Evidence without the residual hearsay exception. The residual hearsay exception exists as Rule 807 of the Federal Rules of Evidence, not as a part of the Alabama Rules of Evidence. It originally was Rule 803(24) of the Federal Rules of Evidence. It reads:
"A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, *285 is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant."
Rule 807, Fed.R.Evid. (emphasis added). In the formulation of the Alabama Rules of Evidence, the Advisory Committee on Rules of Evidence appointed by the Alabama Supreme Court recommended the adoption of this same rule as Rule 803(24) of the Alabama Rules of Evidence. This recommendation was published as part of the Proposed Alabama Rules of Evidence in the Southern Second advance sheet dated May 13, 1993, 615 So.2d no. 2, pursuant to a Supreme Court order dated April 27, 1993 and published in the same advance sheet. However, by order dated July 19, 1995, published in the volume of the Alabama Reporter containing 656-659 So.2d, the Supreme Court adopted the Alabama Rules of Evidence without the proposed Rule 803(24). The Advisory Committee Comments to Rule 803 as adopted state:
"Paragraph (24). Absence of residual or catchall exception. It should be noted that these rules do not include what is known as a `residual' or `catchall' exception to the hearsay rule. See Fed. R.Evid. 803(24). The committee expresses no position as to whether the Alabama Supreme Court may expand the number of hearsay exceptions by decision. See Dallas County v. Commercial Union Assurance Co., 286 F.2d 388 (5th Cir.1961). However, the committee believes that any expansion in the number of hearsay exceptions generally should be accomplished, rather than on a case-by-case basis, by the Alabama Supreme Court's acting under its authority to prescribe rules of practice and procedure. Nothing in these rules, of course, limits any authority in the Alabama Legislature to enact exceptions to the hearsay rule. See Ala. R. Evid. 802."
This same comment is currently maintained as the last of the "Advisory Committee's Notes" to Rule 803, Ala. R. Evid., as it presently exists, still without the "residual or catchall exception." Yet the Court of Criminal Appeals relies on the "guarantee of trustworthiness" that constitutes the basis of this rejected "residual or catchall exception" to the hearsay rule as the basis for the holdings of that court that the hearsay in this case was harmless and the error in admitting the hearsay was harmless. This rationale by that court, if approved, would achieve the same result as the "residual or catchall exception" to the hearsay rule would allow, even though the Alabama Supreme Court has expressly rejected this exception.
Third, the holding of the Court of Criminal Appeals to the effect that certain corroborative testimony at trial supplied "a guarantee of trustworthiness and indicia of reliability" conflicts with the holdings of the United States Supreme Court. The Court of Criminal Appeals held:
"In the present case, hearsay testimony concerning the prior instances of domestic abuse is given a guarantee of trustworthiness and indicia of reliability *286 through the eyewitness testimony of the police officers concerning the victim's physical injuries after the earlier assault, the prior convictions of the [defendant] for third-degree assault and menacing as to the victim, and the eyewitness testimony of the State's witness concerning the [defendant's] actions in ramming her automobile and attempting to drag the victim out of the car."
Baker, 906 So.2d at 243. The United States Supreme Court has held:
"We have squarely rejected the notion that `evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears "particularized guarantees of trustworthiness."' [Idaho v.] Wright, 497 U.S. [805], at 822 ... [(1990)].... `To be admissible under the Confrontation Clause,' we held, `hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.' Ibid."
Lilly v. Virginia, 527 U.S. 116, 137-38, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). Addressing out-of-court declarations admitted into evidence pursuant to the Idaho residual hearsay exception, Rule 803(24), Idaho R. Evid., which is virtually identical to the rule rejected by the Alabama Supreme Court, as already discussed, the Idaho v. Wright Court explained:
"Although we have recognized that hearsay rules and the Confrontation Clause are generally designed to protect similar values, we have also been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements. The Confrontation Clause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. ...
"....
"`[E]ven if certain hearsay evidence does not fall within "a firmly rooted hearsay exception" and is thus presumptively unreliable and inadmissible for Confrontation Clause purposes, it may nonetheless meet Confrontation Clause reliability standards if it is supported by a "showing of particularized guarantees of trustworthiness."' ...
"....
"We agree that `particularized guarantees of trustworthiness' must be shown from the totality of the circumstances, but we think the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief. ...
"....
"To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial."
Idaho v. Wright, 497 U.S. 805, 814-22, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (citations omitted and emphasis added).
Fourth, the reliance by the Court of Criminal Appeals on "the prior convictions of the [defendant] for third-degree assault and menacing as to the victim" to corroborate the hearsay evidence is not supported by the record. No such convictions were admitted during the guilt phase of the trial.
Fifth, after subtraction of the inadmissible hearsay features of the testimony about the six incidents of domestic violence preceding the date of the killing, the only remaining evidence from those incidents consists of the witnesses' observations of *287 certain minor injuries that cannot be legally attributed to the defendant; Ms. Riggins's eyewitness account of the defendant's acts against her and Tracy on March 22, 1994; and Tracy's statement to officer Woodruff, admissible only on the issue of Tracy's will, or consent, in accompanying the defendant on the fatal car ride, that "she was afraid [the defendant] was going to kill her." The fact of the officers' responding to the calls relayed to them by the police dispatcher was no more evidence against the defendant than the multiple-layered hearsay of the calls themselves, which were not admitted. Tracy's expression of her own fear, in and of itself, without any impermissible inference of the truth of her stated basis of that fear, Rule 801(c), Rule 802, Rule 803(3), and Rule 704, Ala. R. Evid., does not tend to prove the defendant's own intent to terrorize. While Tracy's expression of her own fear was relevant, as already explained, to the issue of her consent or lack of consent to accompany the defendant on the fatal car ride and, if the defendant were found guilty of capital murder, might be relevant to the issue of the existence or nonexistence of the heinous-atrocious-or-cruel aggravating circumstance, § 13A-5-49(8), Ala.Code 1975, this latter relevancy would be limited to the penalty phase of the trial and would not be applicable to the guilt phase of the trial.
Sixth, on the critical issue of the defendant's intent to terrorize Tracy, the illegal hearsay proof of five of the incidents of prior domestic violence against Tracy was not innocuous or merely cumulative with the legal eyewitness proof of the March 22, 1994 incident. The State, in its opening statement to the jury, recounted all six prior incidents of domestic violence and, in closing argument, detailed them again. The closing rebuttal by the State again reminded the jury of the hearsay and its tendency to prove the defendant's "intent."
The issue before us is the existence or nonexistence of a reasonable possibility that the erroneously admitted hearsay might have prompted the jurors to find intent to terrorize, and thus to find guilt of kidnapping in the first degree, and thus to find guilt of capital kidnap-murder.
"We are not concerned here with whether there was sufficient evidence on which the [defendant] could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."
Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).
"[T]he original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in Fahy v. State of Connecticut about `whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our Fahy case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same *288 result as that aimed at in our Fahy case."
Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (footnote omitted).
The inadmissible hearsay in the case now before us was literally the very first evidence in the case-in-chief of the State. In presentation and in argument this inadmissible hearsay was the keynote of the prosecution. Indeed, in closing, the State argued, "That man sitting right over there, I submit to you, likes to beat on his wife."
"`[T]he prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.'"
Ex parte Cofer, 440 So.2d 1121, 1123 (Ala. 1983) (quoting Charles Gamble, McElroy's Alabama Evidence § 69.01(1) (3d ed.1977)). "Evidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant." Ex parte Cofer, 440 So.2d at 1124. As in James v. State, supra, the jury argument by the State emphasizing the erroneously admitted hearsay exacerbated the prejudice. Thus, this Court is not "able to declare a belief that [the error] was harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24, 87 S.Ct. 824.
For the erroneous admission of the inadmissible hearsay, the defendant's capital murder conviction must be reversed and the case remanded for a new trial. Two caveats may prevent other errors upon the retrial.
First, the trial court, in sentencing the defendant to death, relied in part on the aggravating circumstance that, "[t]he capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." § 13A-5-49(7), Ala.Code 1975. The sentencing order states:
"I find that the evidence supports this. A misdemeanor charge of assault III was pending against the defendant on a warrant taken out by his wife. This charge had been reinstated because the wife had not appeared for court previously because the defendant physically kept the wife from appearing in Court."
This finding is contradicted by the finding, in the same sentencing order, that "[t]he evidence showed beyond a reasonable doubt that the Defendant planned the killing of his wife solely because he was jealous." (Emphasis added.)
Second, the opinion of the Court of Criminal Appeals in this case, 906 So.2d 210, expressly approves the prosecutor's showing photographs to the jurors during his opening statement, before the photographs had been admitted into evidence. While the trial judge's allowing this tactic did not constitute plain error in this case, the tactic certainly should not be encouraged. Except by agreement of the parties, jurors should not see or hear evidence before its admission as such. See Acklin v. State, 790 So.2d 975, 1004 (Ala.Crim. App.2000).
Finally, we note that the opinion by the Court of Criminal Appeals, 906 So.2d 210, contains the same language we have previously expressly disapproved on a number of occasions. It reads:
"There is irony in a convicted murderer's contending on appeal that pictures of the corpse of his victim might have inflamed the jury. That risk comes with the territory. Perpetrators of crime that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence." (Internal quotation marks and citations omitted.)
*289 As we have observed, this language assumes the defendant's guilt as of the time the defendant is objecting to the introduction of the photographs during his trial, when the purpose of the objection is to avoid an unfair conviction. Our cases disapproving this language or similar language are Ex parte Duncan, 827 So.2d 861 (Ala.2001); Ex parte McWhorter, 781 So.2d 330 (Ala.2000); Ex parte Wilson, 777 So.2d 935 (Ala.2000); Ex parte Loggins, 771 So.2d 1093, 1105 n. 3 (Ala.2000); and Ex parte Samra, 771 So.2d 1122, 1122 n. 1 (Ala.2000).
REVERSED AND REMANDED.
HOUSTON, LYONS, HARWOOD, and WOODALL, JJ., concur.
STUART, J., concurs in part and dissents in part as to the rationale and dissents from the judgment.
SEE and BROWN, JJ., dissent.
STUART, Justice (concurring in part and dissenting in part as to the rationale and dissenting from the judgment).
"`Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' Edward W. Cleary, McCormick on Evidence 584 (1972). Hearsay is not admissible except as provided by the Alabama Rules of Evidence or by other rules adopted by the Supreme Court of Alabama or by statute. Ala.R.Evid. 802. Hearsay is not admissible because it violates the right of confrontation and cross-examination guaranteed by the Sixth Amendment to the United States Constitution. To overcome the inability to confront a witness, a statement by an out-of-court declarant must bear ... `adequate indicia of reliability.' Reliability can be inferred in a case where the evidence falls within a firmly rooted hearsay exception. Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), quoting Ohio v. Roberts, 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)."
James v. State, 723 So.2d 776, 779 (Ala. Crim.App.1998).
I agree with the majority that the victim's statements to her friends Darlene Riggins and Sharion Walker describing acts of domestic violence against the victim by Bobby Baker constitute inadmissible hearsay. See Laney v. State, 643 So.2d 1024 (Ala.Crim.App.1994)(holding that statements made by the victim to a friend about past assaults the defendant had made upon her were inadmissible hearsay); and Jones v. State, 570 So.2d 775 (Ala.Crim.App.1990)(holding that statements made by the victim to his family a few hours before the defendant shot him about his relationship with the defendant were inadmissible hearsay).
I further agree with the majority that the victim's statements to Officers Riley, Smith, and Martin as presented in the record before us constitute inadmissible hearsay. I believe, however, that had the State laid the proper predicate the victim's statements to the officers may have been admissible as excited utterances.
One firmly rooted hearsay exception is an excited utterance. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement cause by the event or condition." Rule 803(2), Ala. R. Evid. Thus, "[a] statement concerning a startling occurrence or condition is admissible to prove the truth of the matter asserted therein, over a hearsay objection, if: (1) it concerns the *290 occurrence or condition and (2) is made while the speaker is under the stress of the nervous excitement created by the perception." Author's Statement of the Rule, Charles Gamble, Alabama Rules of Evidence § 803(2) (1995).
Had the State laid the proper predicate and established that the victim's statements to the officers were made under the stress of nervous excitement and fear and not upon reflection, those statements could have been properly admitted to establish Baker's intent to terrorize the victim. See Jackson v. State, 629 So.2d 748, 756-57 (Ala.Crim.App.1993); Ex parte Whisenhant, 555 So.2d 235 (Ala.1989); United States v. Rivera, 43 F.3d 1291 (9th Cir.1995)(statements made by rape victim were properly admitted under Rule 803(2), Fed.R.Evid., despite time lapse of 30 minutes between rape and statements because the victim was clearly still under stress or excitement of the rape); Dawson v. Commonwealth, 867 S.W.2d 493 (Ky.Ct.App.1993)(holding admissible victim's statement to officer immediately after incident of domestic violence and holding inadmissible victim's statement to another officer at a later time because of lack of spontaneity). Thus, if the State can establish that the victim's statements to Officers Riley, Smith, and Martin about the acts of domestic violence against her by Baker were excited utterances, the evidence may be admissible over a hearsay objection as evidence of intent to terrorize under Rule 404(b), Ala. R. Evid.
I agree with the majority's holding that the victim's statement to Officer Woodruff that she was afraid Baker was going to kill her was admissible as evidence of the victim's state of mind. I disagree with the majority that is the only purpose for its admissibility. The evidence was also admissible over a hearsay objection as Rule 404(b) evidence of intent to terrorize. The testimony of Officer Woodruff, as presented, detailing the victim's statements regarding a car ride with Baker to the Citgo gasoline service station satisfies the requirements of an excited utterance and, therefore, was properly admitted over Baker's hearsay objection. Officer Woodruff testified that when she arrived at the scene, Tracy Baker was sitting in a man's pickup truck. She testified that the victim had informed her that she had jumped out of a car being driven by Baker when he stopped at the Citgo station allegedly to purchase some duct tape to tie her up, that she ran to a truck in the parking lot and got in it, that she informed the man in the truck that he had to telephone the police and that she was not going to get out of his truck until the police got there, and that she did not get out of the truck until Officer Woodruff arrived. These facts establish that the statements were spontaneous and that they were made after a startling occurrence; therefore, they can be considered excited utterances. I maintain that the victim's statements presented through the testimony of Officer Woodruff were properly admitted over a hearsay objection as Rule 404(b) evidence of intent to terrorize.
The Court of Criminal Appeals, citing James v. State, 723 So.2d 776 (Ala.Crim. App.1998), held that the testimony of the law-enforcement officers regarding statements made by the victim describing acts of domestic violence against her by Baker constituted inadmissible hearsay. The facts in James, however, are distinguishable from the facts in this case relating to Officer Woodruff's testimony.
In James, the trial court admitted into evidence police reports that had resulted from complaints against James by the victim and her grandmother. The victim had filed three complaints charging harassment *291 and one complaint charging burglary. The State presented the police reports to show that James had threatened the victim in the months before she was killed. The Court of Criminal Appeals concluded that because the statements the victim and her grandmother made to the police officers were made days after the events being reported, the statements constituted inadmissible hearsay. The Court of Criminal Appeals specifically noted:
"The complaints were not voiced perceptions of an occurring event, but were recollections of past events. The declarants had time to plan and to formulate their statements before telephoning the police. Therefore, there was no evidence that the statements of [the victim] had the requisite indicia of reliability or `particularized guarantees of trustworthiness' to overcome their characterization as hearsay."
723 So.2d at 781.
Unlike the statements of the victim and her grandmother to the officer in James, the statements made by this victim to Officer Woodruff occurred immediately following Baker's act. The testimony indicates that the victim's complaint was made when the officer responded to an emergency call and that the victim was still in a state of emotional stress when the officer arrived on the scene. Consequently, the victim's statements were properly admitted to show Baker's intent to terrorize the victim.
I further disagree with the majority's conclusion that the improper admission of the evidence that was hearsay was not harmless. I believe that the testimony concerning Baker's prior abuse of the victim was harmless in light of the following: (1) Although inartfully presented through the testimony of Officers Smith and Riley, but evidenced by Exhibit A (a list of Baker's arrests and the disposition of those arrests), evidence was presented indicating that Baker had been arrested and convicted of harassing his wife; (2) eyewitness testimony was presented by the State from a witness who was present with the victim in a car when Baker rammed his car into the car she and the victim were in and attempted to drag the victim out of the car; (3) Baker's admission in his statement that he shot through the front door of Sharion Walker's residence with an assault rifle demanding to know the victim's whereabouts; (4) Baker's admission that he heard the victim tell him that she would not get in the car because she knew he was going to kill her; and (5) Baker's admission to shooting at the victim while she was in the car "just trying to scare her." This evidence amply establishes Baker's intent to terrorize the victim and renders innocuous the improperly admitted hearsay evidence.
Based on my reading of the record, there is no "`reasonable possibility that the evidence complained of might have contributed to the conviction.'" Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)). Merely because the inadmissible hearsay was the first evidence presented and mentioned by the State in its argument does not create such prejudice to overcome the condemning evidence of the intent to terrorize, much of which was established through Baker's statement, or the overwhelming evidence that Baker killed his wife. Consequently, I must dissent from the judgment reversing Baker's conviction.